FARMERS' LOAN & TRUST CO. v. CAPE FEAR & Y. V. RY. CO. et al.

(Circuit Court, E. D. North Carolina. March 31, 1897.)

RAILROADS—FORECLOSURE—METHOD OF SALE — APPORTIONMENT OF PROCEEDS.

A railroad company, whose road consisted of three divisions, by a single instrument mortgaged the entire road, with all its property and franchises, to secure three series of bonds. Each series was declared to be a first lien on one of the three divisions respectively, and a subordinate lien on the two others. In case of default the trustee was authorized to take possession of and operate the entire road, and pay interest on all the bonds without distinction. In case of sale the property was to be offered first as a whole, and, if no satisfactory bid was received, then the divisions were to be sold separately. *Held*, that on foreclosure every effort should be made to preserve the road intact by selling it as a whole, rather than by divisions, including in the sale also a leased road, which had been practically merged in the system; and, as this would involve the difficulty of apportioning the proceeds to the different series of bonds, the cause should be referred to a master to ascertain the relative value and earning capacity of the different divisions, in order to reach a basis for apportionment.

This was a foreclosure suit, instituted by the Farmers' Loan & Trust Company, as trustee, against the Cape Fear & Yadkin Valley Railway Company and others.

Turner, McClure & Rolston, for Farmers' Loan & Trust Co.

George Rountree, for Cape Fear & Y. V. Ry. Co.

Watson & Buxton and Robert O. Burton, for North State Imp. Co.

Seward, Guthrie, Morawetz & Steele, for New York bondholders' committee.

Cowen, Cross & Bond, for Baltimore bondholders' committee.

SIMONTON, Circuit Judge. The case is now ripe for a final decree. Before reaching this point, a question has been made, how shall the property be sold? The purpose of these proceedings is to secure the rights of creditors and of shareholders by realizing the value of the property, and by distributing this among those entitled to it. Before such distribution can be made, this value must be ascertained. How such ascertainment can be had is, therefore, the paramount question, preceding all others. The court has been aided by arguments of unusual ability from counsel who represent plans adopted by the Baltimore committee and by the New York committee of bondholders. Each of these presents a different plan of reorganization. The presentation of the plans gave an opportunity for a discussion from which the court has derived great benefit, information, and assistance. But it would be as improper as it is impossible for the court to adopt either of these plans. They fulfill their office when they have satisfied the court—as in fact they do satisfy it—that there are persons able and willing to purchase the property, and that, therefore, it can safely be brought to a sale. That sale must be at public auction, open to the world. It must not be chilled or impeded by the adoption in advance of any plan of reorganization. The sale and purchase, in point of time as well as in point of law, must precede any attempt at reorganization. In order, also, to promote a favorable sale, it is important to know in

advance how the proceeds of sale should be distributed among the classes of bonds proved. With this knowledge holders of bonds could determine what course to pursue at the sale. The circumstances of this case are peculiar. We have not to deal with bonds having priority and lien over the whole road. But we deal with bonds of three classes, each of which has a lien of its own on an aliquot part of the railroad property, and a subordinate interest on the other parts of it.

The Cape Fear & Yadkin Valley Railroad Company is the result of earnest and persistent effort upon the part of the citizens of North Carolina to secure a railroad from tide water to the mountains, aided by liberal appropriations and material assistance of the legislature and of the counties interested in the project. The enterprise first took form in the enactment of an act to incorporate a company to construct a railroad from some point on the Cape Fear river at or near Fayetteville to some point in the coal regions hereafter to be determined, ratified 24th December, 1852. Various other acts were passed from time to time having the same object in view. The railroad was first called the Western Railroad Company, but, after consolidation with one or more companies, the name of the company was changed to that of the Cape Fear & Yadkin Valley Railroad Company, and on 14th March, 1881, an act was ratified looking to the completion of the road with Wilmington as one of its termini. In 1883 there was a complete reorganization of the enterprise, by which authority was given to the said railroad company to extend its main line to the city of Wilmington and to the Virginia line. By section 5 of this act of 1883, it is enacted as follows:

"Sec. 5. That the said company so reorganized, shall have full power and authority to make a mortgage upon all of its property, effects and franchises of every kind whatsoever, to secure the payment of its bonds, and to issue bonds in such sums as it may deem proper, bearing interest at the rate of six per cent. per annum, and to run for the period of thirty years from the date thereof, to the amount of fifteen thousand dollars per mile upon each mile of said road already constructed, or which may hereafter be constructed, and of any branch or branches of said road, and that said mortgage and the bonds issued thereunder shall be a first lien, and have priority over every other claim against the company. The said mortgage, when duly executed, shall be registered in the register's office of the county of Cumberland, and registration in said county shall be deemed an effectual and sufficient registration for all purposes, and it shall not be necessary to register the same in any other county, any law to the contrary notwithstanding."

At this time the road consisted of three divisions, known respectively as Divisions A, B, and C. Division A extended from the city of Greensboro to Fayetteville, and thence to the South Carolina line, and was fully built and equipped. Division B was in the course of construction, and extended from Greensboro westward to Mt. Airy. Division C was in contemplation, and extended from Fayetteville to the city of Wilmington. There were outstanding liens on the Divisions A and B. The company resolved to exercise the power given it by this act of 1883 by the execution of two mortgages upon the entire property and franchises of the company owned or thereafter to be acquired; one of them to be a first mortgage to secure bonds to the amount of $10,000 per mile upon the road then constructed or to

be thereafter constructed, and to be divided into such series, and to attach as liens in such manner, as the board of directors may determine; and also a second income mortgage on the same property at $5,000 per mile,—thus exhausting the power of mortgage given in section. 5. On 1st June, 1886, this resolution was carried into action by the execution of a mortgage to the Farmers' Loan & Trust Company of New York by said railway company. This mortgage recited the fact that two other mortgages had been theretofore created in June and October, 1883, securing certain bonds, and covering the property thereafter conveyed, which bonds, in order that the present mortgage should be made, had been surrendered for cancellation. It then, after other recitals, proceeds to mortgage that certain railroad extending from the city of Greensboro to Fayetteville, and from Fayetteville to the boundary line between the states of North Carolina and South Carolina, where it intersects the same; and also that certain line of railroad extending from Fayetteville aforesaid to Wilmington, when the same shall be constructed; and also that certain line of railroad now being constructed, extending from Greensboro aforesaid to the boundary line between the state of North Carolina and the state of Virginia, at a point near Mt. Airy, together with the right of way for said railroad, and also all depots and station grounds and buildings thereon, and also all shops, engine houses, turntables, water stations, warehouses, and lots, gravel pits, stone quarries, and other real estate used in operating said road, or in connection therewith, with all side tracks and any other lands or buildings connected therewith, or which may hereafter be acquired, all rolling stock, equipments, machinery, etc., then owned or afterwards to be acquired, together with all corporate rights, privileges, and franchises then possessed or thereafter to be acquired by the railway company, including all tolls, income, rents, etc., then owned or thereafter to be acquired by the railway company. All of these to be held in trust for the holders of the bonds issued thereunder, without preference as to priority in the time of issuing the same, but with a preference and distinction of lien as regards the several series of bonds as thereinbefore specifically set forth. The distinction as to lien herein referred to is as follows: The said bonds shall be divided into three series of bonds,—that is to say, series A bonds, series B bonds, and series C bonds,—and they shall attach as liens upon the property hereby mortgaged in the following manner; that is to say: Series A bonds shall be a first lien on that portion of the railroad which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, together with all station houses, sidings, and other property of whatever nature appurtenant thereto, and a lien in common with series C bonds, but subordinate to series B. bonds, upon that portion of the road which is now being constructed between Greensboro and the Virginia line via Mt. Airy, together with the property appurtenant thereto; and also a lien in common with series B bonds, but subordinate to series C bonds, on that portion of the road between Fayetteville and Wilmington, when the same shall be constructed, together with the property appurtenant thereto. Series B bonds shall be a first lien upon that portion of the road which is now being constructed

between Greensboro and the Virginia line via Mt. Airy, together with all station houses, sidings, and other property of whatever nature appurtenant thereto, and a lien in common with series C bonds, but subordinate to series A bonds, upon that portion of the road which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, together with the property appurtenant thereto; and also a lien in common with series A bonds, but subordinate to series C bonds, on that portion of the road between Fayetteville and Wilmington, when the same shall be constructed, together with the property appurtenant thereto.   Series C bonds shall be a first lien upon that portion of the road between Fayetteville and Wilmington when the same shall be constructed, together with all station houses, sidings, and other property of whatever nature appurtenant thereto, and a lien in common with series B bonds, but subordinate to series A bonds, on that portion of the road which lies between Greensboro and Fayetteville and Fayetteville and the South Carolina line, together with the property appurtenant thereto; and a lien in common with series A bonds, but subordinate to series B bonds, on that portion of the road which is now being constructed between Greensboro and the Virginia line via Mt. Airy, together with the property appurtenant thereto.   There are the usual provisions in case default be made in paying interest on the bonds, making no distinction whatever between them, and permission is given to the trustee, in case of default, to enter and take possession of the property, operate the same, pay expenses of operation, and then interest on the bonds without distinction, or to sell the property at the request of one-tenth of the holders of bonds, again without distinction between the bonds. The article as to the mode of sale is in these words:

"Sell and dispose of at public sale all and singular the said railroad, estate, real and personal, corporate rights, franchises, and premises hereby mortgaged, or agreed or intended so to be, to the highest bidder, offering the same first as an entirety, and, in case no acceptable bidder is forthcoming for the said property as an entirety, then the said trustee shall proceed to sell separately the three divisions of the road hereinbefore made, and upon which the several series of bonds are hereby made, or intended to be made, first liens."

The proceedings for foreclosure having been instituted in this court, and a receiver having been appointed, and the time having arrived for a final decree, the first question which is met at the threshold is: How shall the road be sold, in divisions, or as an entirety?  How shall the proceeds of sale be apportioned among the several classes of bonds in case, as is more than probable, a sum sufficient to pay the entire sum due, with expenses, be not realized from the sale? This railway company derives all of its powers and privileges from the state which created it, and the bondholders enjoy the security of the mortgage because the act of the legislature granted this power to the railway company.   The purpose and intent of the state was to secure an entire line of railway from its principal seaport to the Virginia line.   It granted the franchise to the company as an entirety, —one indivisible franchise,—granted for the purpose of constructing and continuing an entire continuous line of road.   The mortgage is also a single instrument of an entire line, intended to secure inter-

est of all bonds and then the principal, giving to each of them as part of its security the franchise of the whole line, and an interest in the entire road and its property. Over the action of the trustee each bond, without any distinction, has an equal voice with every other bond. The trustee must see to it that the interest on every bond is paid. One-tenth of all the bonds, without distinction, can secure a declaration that all of the bonds are payable at once, and can require the trustee to enter and take possession of the whole mortgaged property. Every part of the railway property is dependent upon and connected with the others, and this interdependence constitutes a part of the value of each of its several parts. Division B, for instance, has a value in its bed, iron, cross-ties, stations, etc. Besides all these, it has a clearly recognized value, because it is a part of a continuous line operated by one set of agents from its western terminus to the sea. The same intrinsic and incidental value exists in each division. If, therefore, the property were offered for sale at auction in separate divisions, it could—probably would—result in a disruption of the entire system, against the purpose of, and defeating the ends sought by the state, for which the corporation was created, and to which it owes its existence and its powers. This will be inconsistent with the general tenor of the mortgage itself, and will utterly destroy an important incident in the value of each division. Besides this, during the operation of this railway as a whole system it has become possessed of certain property rights secured for the benefit of the whole system. These are the lease of the South Carolina Pacific, connecting at the South Carolina line, and extending to Bennettsville, S. C.,—a valuable feeder. If the road be sold in divisions, this connection would be valuable to and could be purchased by the purchaser of Division A only, at his own price. From time to time branch roads have been constructed, connected with Division A and with Division B. They are valuable because of this connection,—because of this connection only,—and are only valuable to the purchaser of the division with which they are respectively connected, who will get each of them at his own price. The franchise cannot be divided. A sale by divisions would destroy it entirely. It is true that under the statute law of North Carolina (section 1936 of the Code of North Carolina) the purchasers of any railroad can form a new corporation, and, if the divisions are sold separately, each set of purchasers can do this. But the present franchise for a line continuous from the northwestern boundary of the state to the sea would be absolutely lost, unless the road and its property be sold as an entirety. In that case only could the purchasers organize a corporation with this franchise. The rolling stock is used on the whole system. It is not needed by any division separated from the whole. A sale by divisions would greatly impair its value. Every bond is entitled to its share of the value of each of these items of value. It would be unjust—it could almost be said it would impair the obligation of a contract—to deprive any of them of this incident of value. It would, perhaps, be improper—at least premature—to say that this railroad property could not or should not, under any circumstances, be sold except as an entirety; not in

divisions.    But this course—a sale of the property as a whole—should not be abandoned, if abandoned at all, except as a last resort, after it has been demonstrated that it is not practicable, due regard being had to the rights of the bondholders of each or any class. For the present, under the stress of the reasons given, it is best to exhaust the effort to sell the whole property as an entirety.    But, if the property be sold as a whole, we are met by a grave problem,—how shall the proceeds be apportioned?    There is a marked difference in the value of the bonds on each division, and of the real value of each division.    Division A meets at Greensboro, one of its termini, the Southern Railway.    At Fayetteville it crosses the Atlantic Coast Line.    At its other terminus it meets a valuable feeder, the South Carolina Pacific.    Division B has fewer advantages, and is less valuable.    So with Division C still less.    This difference must be ascertained, and the proceeds of sale apportioned.    Ordinarily putting up property at auction in open market is the best test of value. This, however, is not the case with railroad property under mortgage.    The holders of the bonds control the sale, and can make the price bid suit their views.    This is almost the universal experience. The South Carolina Railway Company, at the end of a foreclosure suit involving questions of liens of five orders of priority, was put up for sale, and was purchased by a controlling syndicate of first consolidated mortgage bonds at the upset price of $1,000,000.    The purchasers resold it within two weeks for over five millions of dollars.    It has been suggested that the separate divisions could be put up at an upset price regulated by the money value of their respective bonds as indicated by recent sales.    But as there is and has not been any great demand for these bonds, their value cannot be fixed by any casual or isolated sales.    If this be a safe guide, why adopt the form of a sale, when the proportionate value could be fixed by the market value of the bonds?    If an upset price cannot be fixed in this way, there is no way of fixing it without some further information.    The practice of this court furnishes a mode of getting such information.    Let the special master, E. S. Martin, take testimony, and report facts proved before him as follows:

(1) What has been the relative earning capacity of these separate divisions for a period of five years; that is to say, what is the value of the aggregate of freight going over each division between its termini, and the value of its passenger traffic, and what are the necessary operation expenses?

(2) What is the cost of repair of its roadbed and track?

(3) What is the comparative estimate of the value of the respective divisions by disinterested persons, who have had experience in railroads, furnishing such estimate under oath under cross-examination, and giving the grounds for the estimate?

(4) Any other facts bearing on this question of actual and relative value.

Let the report contain only the facts given in evidence, so that the court can reach its own conclusion.

## On Rehearing.

### (June 15, 1897.)

A decree for the sale of the railroad property was entered on the 31st day of March, 1897. By that decree it was ordered that the property be sold as a whole. The mode of sale—whether in divisions or as an entirety—is wholly within the discretion of the court. Among the reasons given by the court for this mode of sale was the passage of an act by the legislature of North Carolina at its last session annulling section 698 of the Code. The effect of this act would be that, if a sale were made by the road in separate divisions, doubt would exist as to the right of the purchaser to obtain a charter of incorporation. The counsel for the New York bondholders asked a rehearing of the decree upon the weight of this reason. Their request was granted, and the case reheard. After an exhaustive argument, the apprehension existing in the mind of the court has not been relieved. On the contrary, the difficulty in obtaining, under the law of North Carolina, a charter for a division of this road, were it sold in this way, and separate purchasers had, seems more manifest. It is not a question what would be the ultimate decision of a court of last resort as to the right of such a purchaser; but it is the existence of a doubt on this point, and the necessity for the solution of the doubt by judicial proceedings. It is urged with great force that each division, if the divisions were put up separately, would be subjected to the same disadvantage, and that it would operate equally upon all; that, under these circumstances, the mode of ascertaining the relative value of each division would not be impaired. But this is not the case. Those interested in one division may not feel the force of the doubt, and they would be willing to go up to the full extent of the value of their division. On the other hand, those interested in the other divisions, and the general public, who are invited to sales of this character, may feel the full force of the doubt, and be deterred from bidding the value of these other divisions. In such case the bids would form no comparison of value. Giving careful reconsideration of the whole matter, the conclusion heretofore reached has not been changed.

At this hearing another matter has been presented by way of petition, showing the relation of the South Carolina Pacific to the Cape Fear & Yadkin Valley Railroad. It appears that this first-named road, by contract between the two corporations, was practically merged into and made a part of the latter road; that by way of fortifying this agreement, and of providing for casualties, a lease for 30 years of all its property and franchises was made by the South Carolina Pacific Railroad Company to the Cape Fear & Yadkin Valley Railroad Company; and that certain shares of stock in the former company were assigned to the latter company. It also appears that these shares are the property of the North State Construction Company. All of this merger and lease antedated the mortgage in this case. Under these circumstances, all the right, title, and interest of the Cape Fear & Yadkin Valley Railroad Company and of the parties to this suit should be sold at the same time, and as a

part of the property of the Cape Fear & Yadkin Valley Railroad Company, and the decree must be modified to meet this result.

It has been suggested that the provision that any purchaser at the sale ordered, when the property is struck off to him, shall at once pay to the master commissioners, on account of his purchase, a sufficient sum to make up, together with the amount already deposited by him as aforesaid, "twenty per cent. of his accepted bid," may be too onerous. Let the decree in this particular be so amended as to strike out the words "twenty per cent. of his accepted bid," and to insert in lieu thereof the words "the sum of two hundred thousand dollars." Let the decree also be amended so as to require that the cash portions of the moneys arising from the sale be deposited in solvent national banks in the state of North Carolina, in such amounts, as to each bank, as will render the deposit perfectly safe. In all other respects the decree of March 31, 1897, is hereby reaffirmed and decreed.