## CALDWELL v. INSURANCE CO.

(Filed November 22, 1905).

*Insurance—False Representations by Agent—Measure of Relief—Estoppel—Instructions.*

1. In an action to recover premiums paid on a life policy, a demurrer to the evidence was properly overruled when it appeared that the plaintiff, an illiterate colored woman, was induced to take a policy upon the false representation of defendant's agent that she could draw out and get the amount due her at the end of ten years.

2. The instruction that "If you find that there was fraud in the transaction and that afterwards the plaintiff ascertained that the policies were not what she contracted for with the agent, and that after this she went on and paid the premiums and kept her life and the lives of the others insured and took the benefit, then she could not raise this question of fraud, although there may have been fraud in the beginning, unless you further find that the defendant's collecting agent and local superintendent lulled her into security and led her to believe that she would get the face of the policies at the end of ten years, or unless she paid the premiums under protest," is supported by the evidence.

3. In an action to recover insurance premiums, where the verdict establishes the fact that the insurance was obtained by the false representation of defendant's agent, the measure of relief is the amount paid with interest.

ACTION by Dinah Caldwell against Life Insurance Co. of Virginia, heard by *Judge M. H. Justice* and a jury, at the March Term, 1905, of the Superior Court of MECK-LENBURG. From a verdict for the plaintiff, the defendant appealed.

The plaintiff alleges that sometime during the year 1895 she was induced by the representation made to her by defendant's agent, to take out policies upon her own life and the lives of her children, in defendant company. That the agent represented to her as an inducement to take out said policies, that at the end of ten years she could withdraw the

amount due her. That, after paying the premium on said policies for a number of years, she learned that she was not entitled to withdraw her money at the end of ten years, as represented. She charges that the representations upon the faith of which she took out the policies, were false and fraudulent and that she was deceived by them. She demands the return of the money paid by her, etc.

Defendant company denies the material allegations of the complaint and avers that if she was misled by any statements made by the agent at the time the policies were issued, she soon thereafter had full knowledge thereof and continued to pay the premiums, whereby she waived any right which she may have had and ratified the contract as it was made and set out in the policies; that she failed to pay the premiums in accordance with the terms of the policies and forfeited the amount 'paid. The case was submitted to the jury upon a single issue. From a judgment following a verdict for the plaintiff, defendant appealed.

*Plummer Stewart* and *C. D. Bennett* for the plaintiff.
*W. B. Rodman* for the defendant.

CONNOR, J., after stating the case: The testimony on the part of the plaintiff tends to show that she is an illiterate colored woman, having ten (10) children. That sometime during the year 1895, while she was engaged as a cook at the Buford Hotel in Charlotte, the superintendent of the defendant company sent for her to come to his office. That upon going to the office he asked her if she had any objection to being "written up," to which she replied that she knew nothing about it—did not know what insurance meant. He said that he would tell her, to which she replied that if he did, she would know nothing about it then, to which he replied, "You will have a nice hearse, nice carriage and a nice funeral." She said, "I can't feel the ride in the

hearse and I can't see the funeral procession." He said, "You will have a heap of money," to which she responded, "I don't want the money if I'm dead. I have got to go to work at 3 o'clock in the morning and am not going to take my money to pay insurance." He said, "I will tell you what you can do. You can come in for ten years and after ten years you can go out." She said, "I don't know anything about this. I have been living with white people ever since I was born. I don't know anything about it and I don't want to fool with it." He said, "Aunty, you can go in for ten years." He said, "That after ten years I could draw out the claim and if anything happened to me the claim would be paid." That, upon the faith of these representations, she took the policies, paying for some years the weekly instalments or premiums thereon. That sometime thereafter a lady with whom she was employed read the policies and in consequence of what she said to plaintiff she saw Col. Jones, a lawyer in Charlotte. That she afterwards went to the agents of the company and complained that the policies were not as represented. Some of the policies were taken up and others given her in their stead. That after much going and coming, she refused to pay any further premiums. She told the agent that her time was up, and he told her that if she got anything she would have to get it by law. We have not set out all of the testimony of the plaintiff; that portion which we have set forth, and there was nothing in her testimony contradictory thereof, shows the gist of the transaction. Defendant demurred to the evidence and moved the court to dismiss the action. We concur with His Honor in his refusal to grant the motion. There was ample evidence that the plaintiff was led to believe that she could "draw out" at the end of ten years. She had in her own, but unmistakable way, refused to be beguiled by the attraction held out to her, regarding a fine funeral and a "heap of money" at her death. It was only when the agent

held out the inducement that she could "draw out" which she understood, and he must have intended that she should understand, to mean getting the amount due her at the end of ten years, that she consented to take the policies, or, as the agent expressed it, "be written up."

In what way, other than receiving the amount due her at the end of ten years, was she to "draw out" her claim, at the end of that period? It is hardly probable that it was in the mind of the agent to gain her confidence and secure her application by assuring her that, if at the end of ten years she grew weary of paying the weekly instalments, she should have the privilege of drawing out empty handed, leaving the whole amount paid in the vaults of the company. She does not appear to be a person who would consent to be "written up" on such terms. If her testimony is true, she was induced to insure upon the representation made to her, as an inducement, that in her old age she would reap the fruits of her industry and economy during the ten years. Her testimony in this respect is uncontradicted; the superintendent, with whom she had the conversation, was not introduced. His Honor carefully and correctly explained to the jury the law governing the case, placing upon her the burden of proof in the strongest language which this court has approved in cases where mutual mistake was alleged. He said: "The burden is upon the plaintiff to show by clear, strong and convincing proof that this transaction was fraudulent and that she was making these payments under representations made by the defendant that were not true. The burden, I say, is on the plaintiff to satisfy you that this was a fraudulent transaction." He instructed the jury, at considerable length, what constituted fraud in a transaction of this character, at all times putting upon the plaintiff the burden of proof. We find no error in this respect. He further charged them: "If you find that there was fraud in the transaction and that afterwards

the plaintiff ascertained that the policies were not what she contracted for with the agents, and that after this she went on and paid the premiums and kept her life and the lives of the others insured and took the benefit, then she could not raise this question of fraud, although there may have been fraud in the beginning, unless you further find that the defendant's collecting agent and local superintendent lulled her into security and led her to believe that she would get the face of the policies at the end of ten years, or unless she paid the premiums under protest." To the last clause of this instruction the defendant excepted for that there was no evidence that she paid under protest. Without undertaking to set forth the testimony, it is sufficient to say that we have given it a careful examination and find that when she first learned that there was something wrong with her policies she endeavored to get them straight, without success. She says that she would go to one agent and he would send her to another and this course was continued until they finally cancelled the policies. She narrates her trials in her own simple and natural way, showing that she was bewildered in the intricate mazes and confusing obscurities of life insurance policies. In this respect she is not singular. In the only way open to her she was constantly protesting that something was wrong about her insurance. She does not appear to have received much light from the source to which she went and was entitled to go. There was ample evidence to sustain His Honor's charge and the verdict of the jury. She proved an excellent character; her testimony both in manner and matter was well calculated to carry conviction to the minds of the jurors. The plaintiff is evidently one of the few remnants of a type of her race illustrating its highest virtues. In the simple duties of life incident to her station, she exhibits a store of saving common sense, when sought out and invited by an insurance agent to visit his office and

discuss the most intricate, promising and sometimes disappointing mode of investing surplus earnings, she tells the agent that she knows nothing of it, and will know nothing when he has illuminated the subject, it is not strange that she gets into trouble. She could not read the policies and it is no serious reflection upon her intelligence to surmise that if she could have done so, she would not have been very much wiser. She did resist the blandishment to which those of her race usually succumb—"a nice funeral"—nor did she surrender to the persuasive assurance for which many accredited with more wisdom, spend a life of slavery, "a heap of money" at her death. There is a vast deal of sound philosophy and sense in the answers made by her to the agent. When, however, the appeal is made to that fear which so constantly throws its dark shadows over human life, poverty in old age—and the assurance is given, as found by the jury, that at the end of ten years she could draw out her claim, she consents to "be written up." His Honor correctly announced the law which gives relief, the jury upon ample evidence have found the facts as testified by the plaintiff. It is admitted that the policies do not entitle her to receive the amount paid in or any other amount at the end of ten years; that on the contrary, she forfeits all that she has paid. Upon the verdict the law declares that as she cannot have what was promised to her, she must have her money back with interest. If the defendant has been compelled to carry the risk during the life of the policies without compensation, it must look to its accredited agent, whom the jury finds made the false representation. This court has uniformly held that in such cases the measure of relief is the amount paid with interest. *Braswell v. Ins. Co.,* 75 N. C., 8; *Lovick v. Ins. Ass'n,* 110 N. C., 93; *Makely v. Legion of Honor,* 133 N. C., 367.

The judgment must be
Affirmed.