The action was brought by the plaintiff to recover damages of the defendant on account of an alleged fraud of the agents of the Greensboro Life Insurance Company. Plaintiff alleged that in December, 1906, the agents of the Greensboro Life Insurance Company induced him to apply for a policy of life insurance for $1,000 by making the following false representations:
(1) That after carrying a policy for two years, if he should become dissatisfied with it, he would have the option to make surrender of same and receive from the company all moneys he had paid to it under said contract, without interest (the interest being offset by the temporary protection to plaintiff under the policy).
(2) That after paying in premiums as much as $700 he would not be required to pay any other or further sum on account of said contract, but that it would become a paid-up policy.
A policy was subsequently issued by the Greensboro Life Insurance Company on the plaintiff's life, bearing date 1 March, 1907; but whether the policy was delivered through the mail or by an agent of the Greensboro Life Insurance Company does not appear. The plaintiff at the time he applied for the policy was 53 years of age, and could read and write. He paid nine annual premiums upon the policy, his last premium being paid in March, 1915. This action was commenced in June, 1917. Plaintiff testified that "a good long time before he started suit" he found out that the policy was not what he thought it was, and he wrote to the company in March, 1914, and inquired how many more premiums he would have to make before he had a paid-up policy, and the company replied under date of 10 March, 1914, advising him that his policy was "a whole-life contract," and that he would have to pay premium as long as he lived. In the following year, after having received this information, he paid another premium.
The defendant has assumed the liabilities of the Greensboro Life Insurance Company.
The court nonsuited the plaintiff, and he appealed.
After stating the case: First. This assignment of error is based upon the refusal of the court to admit in evidence the letter of another person to the company, which purported to have been sent by D. W. Cochrane to the plaintiff, and is untenable for two reasons: First, it was not identified. Plaintiff did not attempt to prove the *Page 655 
signature of D. W. Cochrane, by whom the letter purports to have been written, but merely offered the letter in evidence without any proof of its genuineness. Letters are not admissible until satisfactory proof has first been made of their authenticity. Lockhart on Evidence, sec. 96. In the case of Beard v. R. R., 143 N.C. 136, this Court said: "While it is well settled that where it is shown that a letter was addressed, stamped and mailed, there is a presumption that it was received by the addressee, it cannot be that the receipt of a letter purporting to be signed by a person is any evidence that it was written by such person. No authorities are cited to sustain the exception." See, also, Woody v. Spruce Co.,175 N.C. 545; Tyson v. Joyner, 139 N.C. 69, and cases cited therein. In the second place, even if the authorship of the letter had been properly proven, it was not competent as evidence in this case, and, besides, was offered by the plaintiff for the purpose of proving that D. W. Cochrane was general agent of Greensboro Life Insurance Company, and, therefore, was merely an offer to prove agency by the alleged declarations of the agent himself. That such declarations are not admissible to prove agency is well settled. Daniel v. R. R., 136 N.C. 517.
Second. This exception is sufficiently answered by what we have said under the first assignment of error. The plaintiff had not qualified himself to swear to the signature of Mr. Cochrane. In fact, he testified that he had never seen him but once in his life, and that was on the occasion of his applying for the policy. He had never seen him write and had never even seen a signature admitted to be his, so far as the evidence discloses. He was simply not qualified to testify to the genuineness of the signature.
Third. This objection is addressed to the refusal of the court to allow the plaintiff to testify as to Mr. Ervin's declaration with respect to Mr. Cochrane's relations to the Greensboro Life Insurance Company. It would seem to be too clear for argument that it is not permissible to prove agency in this way. It was hearsay, or the unsworn declaration of a third party, not qualified to bind the defendant. 1 Greenleaf Ev., sec. 99.
Fourth. Defendant was allowed to ask plaintiff, on cross-examination, if he did not receive a letter from defendant under date of 10 March, 1914, advising him that his policy was a whole-life contract, and that he would have to pay premiums as long as he lived, and plaintiff excepted to the admission of this testimony. It was clearly competent and material for the purpose of showing that plaintiff paid a premium after he acquired this information and waited for more than three years thereafter before instituting this action. The letter was read to the court and jury, and then the witness, who was the plaintiff, was asked *Page 656 
if he received the letter, which he admitted, and if it did not notify him of the true nature of his policy, which he also admitted, and then stated that after being thus informed as to the contents of the policy he paid a premium a year afterwards. We can see no possible objection to this evidence. It was merely repeating what was in the letter.
The real question in the case is whether upon the admitted facts the defendant is liable to the plaintiff in damages to the amount of premiums paid by the latter, with interest thereon.
The contract of insurance is plainly worded, and there is no difficulty in ascertaining its meaning by reading it. It is a printed policy, there being no handwriting on it except the signatures of the officers, and they are easily read. The plaintiff testified that he could read print and sign his name, and yet he kept the policy in his possession for about nine years without even looking at it himself or asking any one to do so for him. He stated that his apprehension was not aroused until he was told by a friend, Dr. Bandy, who held two similar policies, that they did not read as represented by the plaintiff to him, so as, in effect, to become paid-up policies when $700 in premiums had been paid upon each of them. Without reading his policy, as far as appears, he wrote to the company, inquiring as to "how many more payments he would have to make until his policy would be paid up," to which the company replied at once that his policy was a "whole-life" one, and that he would have to pay premiums as long as he lived. This, he says, did not correspond with the representation of D. W. Cochrane, the agent, which was made to him at the time he was solicited to take the insurance, and which induced him to enter into the contract.
We are of the opinion that plaintiff was guilty of negligence in not reading his policy. While the agent, according to plaintiff's testimony, which must be taken as true, misrepresented the contents of the policy as to when it would be paid up, there was no fraud, trick, or artifice resorted to at the time the policy was delivered in order to prevent the plaintiff from reading it, and he kept it for nine years without doing so.Floars v. Ins. Co., 144 N.C. 232, citing Upton v. Triblecock, 91 U.S. 45;Bostwick v. Ins. Co., 116 Wis. 392. See, also, Clements v. Ins Co.,155 N.C. 57; Wilson v. Ins. Co., ibid., 173.
In the Clements case, the Court, quoting from Floars v. Ins. Co., supra, said: "There is also strong authority for the position that on the facts of this case the relief sought would not be open to plaintiff even if there had been a mutual mistake in the preliminary bargain and by persons with full power to contract, for the reason that plaintiff accepted the policy with the alleged stipulation omitted without having read same, and held it without a protest for three months," citing Upton v. Triblecock, supra. But however this may be, the plaintiff, *Page 657 
after he had been fully and explicitly informed as to the true contents of his policy, and that it contained no such provision as the one he stated that the agent had represented to him was in it, kept his policy for some time without reading it and without making any complaint to the company, and actually paid the next maturing premium about a year after he had received the information from the company itself. This was a waiver of any fraud practiced upon him nearly ten years before, if there was such. His paying this premium voluntarily to the company after obtaining full information as to the contents of his policy amounted to a clear decision by him not to avail himself of the fraud. The act of paying the premium under the peculiar circumstances was inconsistent with any contention on his part to take advantage of the false representation of the agent at the time the contract of insurance was made.
It was held in Jones v. Ins. Co., 153 N.C. 388, where an allegation of fraud similar to the charge against the agent in this case, that if, notwithstanding the fraud, the policyholder afterwards, with knowledge of the facts, paid premiums it would be a waiver of the fraud unless the payment of the premium was itself induced by fraud, of which in that case there was no evidence, nor is there any in this case. But Cathcart v. Ins.Co., 144 N.C. 623, would seem to be decisive of this case, the facts being similar to those in this record. The Chief Justice, delivering the opinion, said: "The defendant asked the court to charge the jury: `The plaintiff admits that at the time he received the policy he could have read it; that nothing was done by any agent of the company to keep him from reading it; that he put the policy away, and several years thereafter he heard general talk among the people that the company would not live up to statements made by the agents, and that he then took his policy and read it, or read such part of it as he saw proper, and the court instructs the jury that, this being the evidence of the plaintiff himself, you will, on the whole evidence, answer the sixteenth issue Yes.' This issue was as to whether plaintiff had waived the right to rely upon the alleged false representations, if made, and it was error to refuse the prayer, for the plaintiff testified that after reading the policy he continued to pay the premiums. This was an acquiescence in the terms and conditions of the policy. The feme plaintiff was even more explicit — that she read the policies again and again, and she and her husband thereafter continued to pay the premiums on all the policies which they had taken out for themselves and their children. The evidence is that the plaintiffs were intelligent people. This case is not like Caldwell v. Ins. Co.,140 N.C. 100, for there the plaintiff was an illiterate old colored woman who could not read the policy, but relied on the statement of the agent. Furthermore, when she became alarmed, *Page 658 
the defendant's agent lulled her into security and induced her to continue to pay the premiums. There was nothing of that in this case." The case ofGwaltney v. Ins. Co. is then distinguished, and Floars v. Ins. Co., supra, cited with approval. Cathcart v. Ins. Co., supra, has since been approved in several cases, as will appear in Anno. Ed. of 144 N.C. at p. 625.
The payment of the premium after a fair opportunity to act deliberately in regard to the matter was an election by the plaintiff to continue the insurance upon the terms stated in the policy. There is no evidence here that the plaintiff at the time he received the policy was prevented from reading it by any trick or contrivance, and if he had read it he would have discovered very easily that there was no such term in the contract as the one he was led to believe was there. In this connection, what was held by the Court in Bostwick v. Ins. Co., supra, is pertinent: "If a person in a business transaction with another is deceived by the latter to his injury, such person may rescind the transaction within a reasonable time after he discovers or has reasonable opportunity to discover the fraud, constructive knowledge thereof being just as effective as actual knowledge to set the time for rescission running and to mark its limits. If a person receives a policy of insurance ostensibly in response to an application therefor, which he signed and parted with in the belief, induced by the fraud of the agent taking the same, that it called for a policy different from that which it called for in fact, he is bound, as a matter of law, to examine the policy within a reasonable time after it comes to his hand and to discover obvious departures therein from the one which he supposed he was to get, and promptly, upon discovering the same, to rescind the transaction, give the company due notice thereof, and do all on his part which justice requires to restore the former situation, or he will be held to have accepted the policy as satisfying his application, so as to be precluded from rescinding the same. The reasonable time for discovering that the policy differs from the one supposed to have been applied for in the circumstances stated in the foregoing rule commences to run immediately upon the reception of the paper, nothing occurring then to reasonably excuse the applicant for omitting to examine his contract. In such circumstances, four and one-half months delay in discovering the fraud and exercising the right of rescission is, as a matter of law, too long a time."
The time within which action should be taken to rescind the contract would to some extent depend upon the circumstances of the particular case. The Bostwick case also decided that "The existence of a cause of action at law to recover the consideration parted with upon a contract on the ground of fraud presupposes the actual termination of the contract because of the fraud, and that requires a repudiation of such *Page 659 
contract by the insured person in toto, or so far as justice may require, and an unconditional offer on his part, so far as justice may require, to restore the wrongdoer to his former situation."
In this case the plaintiff has repudiated the contract and elected to sue for the entire consideration paid by him — that is, the premiums, with interest. Plaintiff has substantially and in law waived the tort and sued for money had and received, which is the premiums paid by him to the company, with interest thereon. He could not be entitled to this specific amount if he had not elected to waive the tort or treated the contract as rescinded, because of the fraud, and recover the entire amount paid. The rule, in a case like this, is that where a party discovers that a fraud has been practiced upon him he must act promptly in his own protection, as laches may bar his right. 25 Cyc., 792; Knight v. Houghtalling, 85 N.C. 17;Howland v. C. L. Ins. Co., 121 Mass. 499, 500; Ins. Co. v. Miller, 32 N.W. 550.
It is said in the Howland case: "If it be assumed that the plaintiff had the right, at his election, to treat the act of the defendant's agent as a rescission of the contract, justice requires that he should give notice of this election within a reasonable time. An election made eleven months after, during which time the liability of the defendant had continued, was not within a reasonable time."
In the Houghtalling case Justice Ruffin, for the Court said: "The rule of law is that he who would rescind a contract to which he has become a party must offer to do so promptly on discovering the facts that will justify a rescission, and while he is able, of himself or with the aid of the court, to place the opposite party substantially in statu quo; he must not only act promptly upon the first discovery of the fraud, if fraud be the cause assigned for the rescission asked, but he must act decidedly, so that his vendor may certainly know his purpose, and thereby have the opportunity afforded him to assent to the rescission, resume the property, and look out for another purchaser. In no case is he permitted to rescind when he has continued to treat with his vendor upon the basis of the contract after his discovery of the fraud practiced upon him, and neither is it allowed him to rescind in part and to affirm in part; but if done at all, it must be done in toto. This rule is founded on the plainest principles of justice, and has been universally recognized, and virtually so by this Court in the cases of McDowell v. Sims, 41 N.C. 278; Tomlinsonv. Savage, ib., 430, and Alexander v. Utley, 42 N.C. 242."
The plaintiff, while not a man of much education, seems to be of fair intelligence, good judgment and practical sense. He understood very well what his rights were. When he discovered what he alleged to be the fraud of the agent he should have acted with reasonable promptness *Page 660 
and notified the defendant that he elected to repudiate it, or to reform it, or to affirm it, and recover his damages for any deceit, but this he did not do, but, on the contrary, he waited for nearly a year, when he paid the premium with full and accurate knowledge of all the facts necessary for him to act upon, and, finally, he did not bring this action until more than three years after he acquired, according to his own admission, full knowledge of the facts, which were disclosed to him by the defendant in the letter. He is, therefore, barred both in equity by laches and at law by the statute of limitations.
Justice Hoke said in Modlin v. R. R. Co., 145 N.C. 227: "The statute applicable (Revisal, sec. 395, subsec. 9) provides that actions of the present kind are barred in three years after the discovery by the aggrieved party of the facts constituting the fraud, and, construing this subsection, the Court has decided that the statute commenced to run when the aggrieved party first discovered the facts, or could have discovered them by the exercise of proper effort and reasonable care."
If he waived the fraud, he cannot sue for damages, as the contract stands, and he is bound by it. So, in no view apparent to us can he recover.
Affirmed.