Ruffin, C. J.
 

 The act of 1831,
 
 Rev. St. c.
 
 26, authorizes two modes of proceeding at the instance of the public against corporations. The one is by
 
 bill of the
 
 Attorney General in the Court of Equity, to restrain them by injunction from assuming or exercising any franchise, or transacting any business not allowed by the charter. This part of the act is applicable only when the purpose is not to dissolve the corporation by a judicial decision, but to preserve it, in order that its useful functions may be performed, and, at the same lime, that it may not be abic to abuse its powers or transcend them. The object of the other mode is to have a forfeiture of the charter or a dissolution of the corporation judicially declared, and a judgment of ouster thereon; and that is to be effected by an information by the Attorney General in a Superior Court of law or in this Court, “.setting forth,
 
 *465
 
 briefly and without technical terms, the grounds on which such forfeiture or dissolution is alleged to have been incurred or to have, taken place.” Of this latter kind is the present proceeding. It is in the nature of a
 
 quo war-
 
 rantoi, and, although the act dispenses with technical formalities, yet it is clear that the information must set out the substance of a good cause of forfeiture, in its essential circumstances of time, place and overt acts. That rule belongs to all pleading, and especially is it proper in reference to a proceeding, in its nature criminatory, to insist upon a forfeiture of valuable franchises, which cost a great outlay of capital. The demurrer by the Attorney General to the defendants’ pleas, necessarily opens the way to objections to
 
 the
 
 information, upon the principle, that, as against the party demurring, we are to go back to the first fault in the pleading ; for it is manifest, for example, that here it is immaterial, whether the matter pleaded be a good bar or not, if the charge itself be so radically defective that no judgment of forfeiture can be pronounced on it. In a
 
 quo warranto,
 
 properly speaking, the charge is general, that the defendants, without lawful warrant, use the franchise of being a body politic, and doing certain acts as a corporation. The plea brings forward the charter, as the warrant for acting as a corporation, and states such parts of it and other acts, as authorize the defendants to exercise the corporate franchise specified, up to the time of the writ brought; and then the replication specifies any number of particular overt acts or omissions, on which it is intended to insist the forfeiture has been incurred, and thereto the defendants may either demur or take issue. Under the statute, however, it was intended to simplify the proceedings by having the whole matter of accusation set forth at once in the information, or, at least, some sufficient matter to entitle the State against an admitted corporation to judgment of ouster. These observations have been made, because, as this is the first proceeding under the act, as
 
 *466
 
 far as is known to the Court, it has been deemed proper . to give some intimation, that the inartificial and extremely loose statements of this information are not approved by the Court, as sanctioned by the act. For example, it does not charge the ' subscribing of the stock or the organization of the company under the charter, as a subsisting corporation at any time, but only an authority in the charter for certain subscriptions for making a rail road from &c. to &c. without giving any names, and then says, that “ the said Petersbm'g Rail Road Company” is invested with the rights and powers necessary to make the said rail road
 
 to be located
 
 as aforesaid. Again, while it charges that it was the duty of the president and directors to render to the legislature, annually, a fair account of the expense in constructing and keeping in repair that portion of the road within this State, it does not shew any part of the act, giving power to the stock-holders, or imposing the duty, of appointing a president and directors,'nor that any were appointed — a thing indispensable to render the stock-holders amenable in this most penal manner for the omissions of the president and directors. Again, it states that the company have now “ for many years had their said road completed, and since the completion thereof’^ have had it in “ constant operation,” without fixing any time whatever, as that of the completion or of the operation of the road, or, stating in what the operation consisted, as conveying persons or things for hire and the like j and while it states that “ the said Petersburg Rail Road Company” ought to have [not “ rendered annually a fair account”] “ returned unto the General Assembly annual reports of.the tolls, &c. of that part of the road in North Carolina, as well as to make returns of the original cost, &c.” it proceeds to charge “ that the said president and directors in behalf of the said Petersburg RailRoad Company, have failed to make the said returns” without shewing any time, when it became a duty to render such account or an omission of it at any particular time or place,.
 
 *467
 
 and without shewing any sum expended or any profits received or accrued. The other part of the information which respects the transaction with Rives, is equally vague and defective. It states that, by the charter, the company can only apply money, subscribed or received for tolls, to making or repairing the road and the payment of dividends of profit to the stock-holders, and, after setting out the purchase by Rives of a part of the Portsmouth and- Roanoke Rail Road, without the franchise of using it as a rail road, it proceeds to state, that on the 14th of June, 184'í, the company entered into a contract with Rives, which is set out in the information, whereby the company binds themselves to pay Rives certain sums on certain days on certain conditions; and that, “ in pursuance of the agreement, the company has already paid to Rives a large amount of the price stipulated to be paid him,” without affixing any time or place to either of the facts alleged, except the date of the contract, and without mentioning any sum or sums in particular, as paid to Rives, or averring that the same had either been subscribed by the stock-holders or received for tolls, or how otherwise raised, as by borrowing or in some other manner. When the legislature required “the grounds” to be set forth “on which the forfeiture is alleged to be incurred,” nothing less could be meant, than that the information, like an indictment or declaration, should state with certainty to a common intent, those facts and circumstances, which constitute the offence in its substance, whether of misfeasance or nonfeasanee: so that, on its face, if true, it may be seen that there is a specific ground in fact, and not by conjectural inference, on which a forfeiture ought to be adjudged. But the Court does not think it necessary to decide the case upon formal defects in the information of these kinds ; because taking it properly to charge the matters, which, as we suppose it was meant to charge, the Court is of opinion, either that it is substantially insufficient, or that the facts alleged by the de
 
 *468
 
 fendants and admitted by the demurrer sufficiently answer it.
 

 There are two grounds, on which it is alleged, that the •forfeiture has been incurred. The one is, that the charter, as set forth, makes it the duty of the president and directors to render to the legislature, annually, a fair account of the expense of making the road in this State and the amount of tolls received on it; and that the president and directors have failed to “ make any returns,” as it is called. Now, it may be supposed to charge the period when the road was made, the cost of it, the period of using it up
 
 to
 
 the last session of the assembly, and the annual profit received or accrued, and that the General Assembly had, during that period, divers sessions at such and such days, and that the company omitted to render an account of the cost of the tolls to the assembly, at any one or more of those sessions; and yet, we think, upon the ground taken in the plea, in answer to that part of the information, that there cannot be judgment against the defendant. A question might, indeed, have been made, as to an omission — if it be so — to render an account •during the year, that elapsed between the rising of the assembly on the 12th of January, 1845, and the filing the information on the 19th of Januarjq 1846, since the charter requires the account to be rendered annually, and it may, perhaps, be still proper to render the account at the period prescribed, although the assembly does not constitutionally have annual sessions, as it had, when the charter was passed. But we do not understand the information as raising that question, and therefore do not consider it, for the information clearly makes the
 
 gravamen
 
 on this part of the case to consist, in not making a return, which would have enabled the General Assembly to regulate the tolls, as provided for in the charter; and therefore has in view only such returns, as ought to have been made before or at the last session of the assembly, which may be supposed to be stated to have been in November
 
 *469
 
 1844, according to the fact. We entertain no doubt, that the omission of an express duty, prescribed by a charter to a corporation, is cause of forfeiture. Its performance is in the nature of a condition, and the sovereign may insist on resuming his grant for the breach of the condition. With respect to the duties arising by implication from the nature of the franchise granted, and the interest of the public in their due and continued performance, we should be inclined to hold, that only such acts or omissions would be destructive of the charter, as concern matters, which are of the essence 6f the contract, between the State and the corporation; when the corporation fails to do that, which, it must be seen, it was intended and expected it would do, or does that which, it is certain, it was intended and expected it would not do. But when a charter, as here, expressly imposes a duty which the company is to perform, not merely to the citizen, but towards the sovereign itself, although it may not declare that non-performance shall make a forfeiture, yet, by no latitude of equitable interpretation can it be regarded as a hard bargain, and, as such, relieved against in a Court of law; but it must be taken to have been required by the State, as a material stipulation, for the nonperformance of which by the corporation, the State may put an end to the contract. But on the other hand, if the sovereign — with us, the law making power — with a distinct knowledge of the breach of duty by the corporation, a knowledge declared by the Legislature, or so clearly to be inferred from its own archives that the contrary cannot be, thinks proper by an act to remit the penalty or to continue the corporate existence, or to deal with the corporation as lawfully and rightfully existing, notwithstanding such known default; such condnct must be taken, as in other cases of breaches of conditions, to be intended as a declaration, that the forfeiture is not insisted on, and, therefore, as a waiver of the previous defaults. It must be so in the nature of tilings; for, while
 
 *470
 
 the State insists on these stipulations in a charter, as conditions, express or implied, in a contract, the citizen has a right, that they shall be dealt with as other conditions, and that a breach shall not be insisted on, when, after it, the parties a.cted and dealt as if there had been no breach ; for example, when a landlord receives rent after he might have entered for non-payment of it. We do not mean that an omission by the Legislature to take immediate legal steps to enforce a forfeiture, for even a cause most notoriously existing, or-that, even in such a case, a statute, recognizing the actual exercise of the corporate functions, would necessarily receive that construction, as, for instance, borrowing money from or keeping account with a bank that had violated its charter. But, in the- case before us, the duty imposed on the company is that of making their president and directors render accounts to the General Assembly itself, so that it could not but be certainly known to the Assembly of 1844, that no return had been made to it; and, in that state of things, the Legislature passed an act on the day before the adjournment, which not only recognizes this corporation as then existing, but authorizes'and requires it to perform acts, which imply that it is to exist for nine months afterwards, at
 
 least;
 
 and such acts as impose
 
 on
 
 the corporation the immediate expenditure of a considerable sum of money and continued outlay for an indefinite period, apparently expected to be co-extensive with the charter. The amended charter allowed the company to extend the road to the canal of Weldon, which is a point on the south side of Roanoke, without expressly directing or authorizing a bridge over the river, though apparently indispensable. After the company had built a bridge, the Legislature requires them to make alterations at their own expense, within nine months, in a work on this new part of théir road, and to keep attendants to open the draw, as long as the bridge shall be kept up. Surely it would not comport with the good faith that
 
 *471
 
 should actuate every government, if the State were to turn around immediately after inducing this further expenditure by the company, and getting the work done, and insist upon a forfeiture for a default that had occurred and was absolutely known to the Legislature to have occurred, prior to or contemporapously with the passing' of the act. The necessary inference from such provisions, in a statute, whether depending on the general principles for the construction of statutes, or regarding them as the acts of a party to a contract with conditions, must be, we think, that the Legislature intended the corporation to continue until there should be a further breach ; and the executive officers of the State cannot counteract the legislative intention by insisting on the prior default. Happily, we have not had occasion, in this State, to become familiar with defaults of corporations, committed or punished ; and we should feel the moi'e hesitation in adopting the conclusion we have, if we did not find it sustained by the authority of decisions by Courts, in which these doctrines have been frequently discussed. In the great case of the Manhattan Company in New York, 9'
 
 Wend.
 
 361, the judgment was--rendered for the defendants principally on this ground.
 

 The other alleged ground is, that the company paid some money to Rives, which they ought
 
 to
 
 have expended on the road or divided among themselves. There is no allegation that the expenditure on the road would have been necessary or useful. There is no complaint of this transaction, upon the ground that its object was contrary to the interest or policy of North. Carolina in any other respect, as, for instance, to prevent the use by the public of the road as a highway, or to obstruct any steps that might legally be taken by the State, or by any under her authority, to appropriate Rives’ part -of the Portsmouth and Roanoke rail road to public uses. ■ Indeed, it is plain, that the agreement had nothing of. the kind in vi,ew; but on the contrary, it provides for the contingen
 
 *472
 
 cy, that the proper authorities, whose action the parties could in no way defeat or bind, should have the road condemned for a rail road. The information then supposes nothing wrong — -save only that money, which it assumes, but does not aver, was part of the capital subscribed, or of the profits of the road — was paid to Rives, instead of being kept by the corporation themselves. To this part of the information, after stating by way of inducement, that there were no profits of that part of the road which lies in North Carolina, received or accrued at the time of making the contract with Rives, nor since, to be divided among the stock-holders, the plea in substance is, that the payments to Rives were made with money which accrued as profits on that part of the road which is situate in Virginia. The plea thus raises an interesting question, which may some day prove embarrassing, with respect to charters granted by two States to the same corporation, constituted to conduct a work situate partly in each State — whether or not it be amenable to each State, exclusively, for every thing touching so much of the work as may be in it, and for the application of the profits arising on each part. The plea supposed, that to North Carolina the company is not to account for not constructing the Virginia portion of the road, or not repairing it, or misapplying the profits made on it. This may be true in respect of punishing the officers by indictment for a default in Virginia, or in respect of adjudging a forfeiture of the charter or the franchise in Virginia, which things clearly depend on territorial jurisdiction. But we are not prepared to say, where, by the charters of the two States, the work is executed, as one whole, by subscriptions of stock applicable alike to the parts, in each State, that one of the States could not insist, as the ground of forfeiture of so much of the franchise, as is used within it, that the corporation had not fulfilled its.. duties in the other State, but violated them to the prejudice of the complaining State. For example, if the char*
 
 *473
 
 ter required that the whole work should be completed by a day limited, and the company made the road in North Carolina, but did not make that in Virginia, would it not be a forfeiture of the part in this State, both because the omission was against the letter of the .act, and because it impaired the utility of the part here, by the interruption of the intended line of transportation and travel ? Suppose the company were to charge on the road in Virginia double the tolls allowed by law, so as to extort from citizens of North Carolina, passing on the same, excessive fees and prevent others, wishing to use the road, from doing so, would it not form just cause of complaint on the part of this State, and, though not expressly declared in the charter, to be in itself a dissolution, ought it not to be considered a breach of duty, arising out of an implied condition of the charter, for so much of the work as is within our jurisdiction
 
 1
 
 For, as implied powers of a corporation are as much protected by the law, against the unjust resumption by the State, as those expressly granted, so the duties of a corporation, arising by reasonable implication, are as obligatory on the corporation as those expressly imposed, and their breach visited by the same consequences. It may be, in this case, that the profits arising from the different parts of the road form distinct funds, as the charter requires an account of those in this State only to be rendered, though, no doubt, that is with a particular view to the regulation of the tolls in this State. But we do not find it necessary to decide either that question, or the more general one raised by the pleas, as before mentioned, because, let the statements in the information be taken, as they may, the facts constitute no offence, that we can perceive. The information does not state, out of what funds the payments to Rives were made, except that it may be collected by argument, from the statements of certain parts of the charter, that it was out of the capital or out of the profits of the road in this State, or out of them and the profits of the road in Virginia. Take it in
 
 *474
 
 any one of those cases, and still there cannot be judgment for the State. For such an appropriation of the money of the corporation produces no prejudice to the State or the public, and is against no stipulation of the corporation to the public, express or implied. There is, indeed, a provision in the charier, that the president and directors shall semi-annually declare such dividends of the neft profits from the tolls, as they may deem advisable. • This we know from reading the charter, and use for illustration; for that part of the charter is not set forth in the information, but it is only said, that by the proper construction of the act, “ the company can only apply their money to certain purposes mentioned, namely, making and repairing-the road and dividing the surplus.” But it is clear that part of the charter is not inserted for the advantage of the State or to protect the State from detriment, either from an accumulation of capital or a misapplication of profits, but solely for the benefit of the stock-holders. Bank charters sometimes require periodical dividends of the
 
 bonus,
 
 as it is called, besides the stated dividends of profits at shorter intervals. That is to prevent the bank from hoarding its profits, so as in effect to enlarge the capital beyond the sum fixed by the legislature by compounding the profits with it; therefore the public has an interest in the observance of such provision and may - insist on it. But the provision in this charter has no such view and is not of that sort, for it leaves the dividends to the discretion of the president and directors, controlled only by their responsibility to the stock-holders, who can turn them out, and are expected to do so, for improperly witholding dividends or misapplying the funds. There is no policy of the State in this case to be subserved by the declarations of dividends, when not demanded or desired by the stock-holders. The provision is exclusively for the benefit of the share-holders; and it would, indeed, be an unheard of measure of penal justice upon the stockholders, if they were to be deprived of their franchise,
 
 *475
 
 because
 
 their servants,
 
 the president and directors, wrongfully witheld
 
 from them
 
 their money and gave it to some one else. But we may take it, that it was not, in this case, the act of the president and directors, as the contract was approved in a general meeting of the stockholders, and therefore what was done under it may be considered as done by their orders or by them. Suppose it so, then we own, that we see nothing in the charter, nor in any duty, which the stock holders, as a corporation, or as natural persons, owe to the public which makes it criminal in them to dedicate their profits to the use of any person whatever. The profits are theirs, and they have a right to dispose of them to any purpose, to'which they might lawfully devote their money, derived from any other source. If what has been done amounts to an assumption of a franchise in that part of the Portsmouth and Roanoke Road, let the proper steps be taken to restrain them from the exercise thereof or to oust them therefrom; but, certainly, the giving Rives their money, whether for a consideration or without it, is no forfeiture by the stock-holders of their own charter — much less when the purpose was to make their road more useful to the public and more profitable to themselves, by drawing travel and freight to it.
 

 The opinion of the Court, therefore is, that there must be judgment on the demurrer for the defendants.
 

 Pku CüRiam. judgment accordingly.