JAMES S. MANNING, ATTORNEY-GENERAL OF NORTH CAROLINA, v. ATLANTIC AND YADKIN RAILWAY COMPANY, SOUTHERN RAILWAY COMPANY, AND ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 3 December, 1924.)

**1. Carriers—Railroads—Merger—Connected Lines — Statutes—Unlawful Combinations—Presumptions.**

A railroad company operating in this State, when expressly or impliedly authorized by State statute, may purchase and absorb within its system another such corporation physically connected with its lines within the State when the latter corporation is likewise authorized to sell; and the presumption obtains, nothing else appearing, that the legislative intent was not to thereby authorize a monopoly or any act on the part of the railroads against the public policy of the State.

**2. Same—Intent.**

The legislative intent is to be gathered from the language used in the statute, and not by the debates upon the floor during its passage, or the understanding of those concerned therein who are not members.

**3. Statutes — Knowledge — Presumptions — Carriers — Railroads—Geographical Divisions.**

In the passage of an act permitting a railroad corporation operating in this State to purchase or acquire connecting lines of railroads, it will be presumed that the Legislature had knowledge of the direct physical connection of the buying and the selling corporations.

**4. Pleadings—Demurrer—Fraud.**

Where the complaint generally alleges a fraudulent intent on the part of railroad corporations in acquiring and absorbing their connecting lines under statutory authority, and from its other allegations it appears that the consolidation was lawfully effected, a demurrer thereto does not admit the fraud vaguely alleged, it being required that the particularities of the fraud relied upon be sufficiently stated in the complaint.

**5. Carriers—Railroads—Entire System — Mortgages—Foreclosure—Purchasers—Laches—Estoppel—Counts—Judgment.**

Where the State and localities along the route of a railroad have acquired an interest therein by subscription to its shares of stock under statutory requirement that the road be operated or sold as an entirety, and in foreclosure proceedings the court has so ordered the sale, and the road has been purchased by another railroad company authorized by statute to sell, and which does thereafter sell to two separate corporations, which divide and separately operate it, each as a part of its own system: *Held*, the corporations so purchasing and independently operating the separate portions are not in violation of the statutory provisions that the road should be operated or sold as a whole, and the Federal requirements as to interstate carriers in such matters become immaterial. As to whether the State, under the facts of this case, had lost its rights by its laches, *quere?*

CLARKSON, J., concurring.

THE plaintiff appealed from a judgment rendered by *Grady, J.,* at February Term, 1924, of WAKE, sustaining the defendants' respective demurrers to the complaint and dismissing the action.

The plaintiff's material allegations, as they appear in the complaint, the exhibits, and the references, are substantially as herein stated. In 1852 the General Assembly incorporated the Western Railroad Company, which was authorized to build a railroad between the town of Fayetteville and the coal region in the counties of Moore and Chatham (Laws 1852, ch. 147); and at a subsequent session it passed an act under which the county of Cumberland and the town of Fayetteville each subscribed $100,000. Laws 1856-57, ch. 71. There were also individual subscriptions to the amount of $134,400. Under a later act the State donated to the enterprise more than $600,000, and in 1868 subscribed in bonds the additional sum of $500,000.

In 1879 the name of the Western Railroad Company was changed to the Cape Fear and Yadkin Valley Railway Company, and the latter succeeded to all the rights, powers, privileges, immunities and franchises of the former, and was authorized to consolidate with the Mount Airy Railroad Company and to complete the roads. Public Laws 1879, ch. 67.

By virtue of an act passed by the General Assembly in 1883, there was a reorganization of the system, and the Cape Fear and Yadkin Valley Railway Company was authorized to extend its main line from Wilmington through the central part of the State to the Virginia line and to build certain branch lines as provided in the act. Public Laws 1883, ch. 190. Under such authority, this company operated as its system, at the time it was sold, its main line, extending from Wilmington to Mount Airy, a distance of 284.28 miles; a branch line extending from Fayetteville to Bennettsville, South Carolina, a distance of 57.75 miles; four branch lines in North Carolina having a trackage of 34.15 miles; and certain sidetracks aggregating 27.17 miles. In the construction and equipment of the road, over $7,000,000 were spent—the State, towns, townships and counties having donated and subscribed more than $1,000,000 of this amount.

The South Carolina Pacific Railway, extending from Bennettsville, South Carolina, to the North Carolina line, was leased by the Cape Fear and Yadkin Valley Railway for thirty years and was merged in it and operated as a part of its system, which constituted a continuous line from Mount Airy to Wilmington. All the franchises, privileges and rights of the latter company were held under its charter as an entirety, and as constructed it was an important artery of commerce, extending through the central part of the State from Mount Airy to Wilmington, and from Fayetteville to Bennettsville. Its western extension crossed the Norfolk and Western Railroad, running to Roanoke, Virginia, open-

ing up the coal region of West Virginia and doing a large interstate and intrastate business, thus competing with the Seaboard, the Southern and the Atlantic Coast Line railroads.

On 1 June, 1886, the Cape Fear and Yadkin Valley Railway Company executed to the Farmers Loan and Trust Company, of New York, as trustee, a deed of trust upon its property and franchise to secure bonds known as Series "A," Series "B," and Series "C," the aggregate amount of which was $3,054,000; and on 1 October, 1889, it executed to the Mercantile Trust and Deposit Company, of Baltimore, as trustee, a consolidated mortgage on its property and franchise to secure an additional bond issue of $1,848,000. In March, 1894, default was made in the payment of interest, and the Farmers Loan and Trust Company brought suit in the Circuit Court of the United States for the Eastern District of North Carolina to foreclose the first mortgage, and the Mercantile Trust and Deposit Company was made a defendant, and, when it resigned its trust, William A. Lash was substituted as trustee and made a defendant to the suit. On the day the bill was filed in the Circuit Court, John Gill was appointed receiver of the Cape Fear and Yadkin Valley Railway Company and took possession of its property. In the suit an attempt was made to force a sale of the property in division, and thereby to dismember the system, but the court refused to permit such sale, and ordered that the property be sold as an entirety. (The case was decided in the Circuit Court, 31 March, 1897. 82 Fed. R., 314.) In the complaint is an extended quotation from Judge Simonton's decision, which it is not necessary to repeat here. There was a rehearing; and on 15 June, 1897, Judge Simonton, adhering to the position that the mode of sale was within the discretion of the court, affirmed his former ruling. Among the reasons given for this mode of sale was the passage of an act amending section 698 of The Code. (Section 698 provided that a corporation created by or in consequence of a sale or conveyance of corporate property under a deed of trust should succeed to the franchises, rights and privileges of the first corporation; and the act of 1897 provided that the purchasing corporation should succeed to such rights, privileges and franchises only in case the first corporation (railroad) was sold as an entirety. Public Laws 1897, ch. 305.) From the decree of the Circuit Court there was an appeal to the United States Circuit Court of Appeals, and the decree appealed from was affirmed on 3 May, 1898. *Low v. Blackford,* 87 Fed. Rep., 392. (Quotation omitted.) The effect was to direct the sale of the property of the Cape Fear and Yadkin Valley Railroad Company as an entirety, thus giving effect to the act of 1897.

The commissioners appointed under a decree of the United States Court sold the property, at Fayetteville, on 29 December, 1898, and, as

reported by the commissioners, H. Walters, V. F. Newcomer, Mitchell Jenkins, and Warren G. Elliott became the purchasers, at the price of $3,110,000, with $15,000 additional for the equipment. The purchasers were officers of the Wilmington and Weldon Railroad Company (now Atlantic Coast Line), and at their request the commissioners, on 31 January, 1899, executed a deed for the property as an entirety to the Atlantic and Yadkin Railway Company. This company was incorporated by an act of the General Assembly ratified on 23 February, 1899, the preamble reciting that in the deed conveying the property to them, and otherwise, under the statutes of the State, the purchasers had declared themselves a corporation by the name of the Atlantic and Yadkin Railway Company, having elected officers and performed other acts as a corporation. (Excerpts from act omitted.)

It is alleged that on 13 May, 1899, the directors of the Atlantic and Yadkin Railway Company, contrary to the provisions of its charter and in violation of the decree of the Federal Court, undertook by resolution to dismember the property of this company, formerly owned by the Cape Fear and Yadkin Valley Railway Company, by selling and conveying to the Wilmington and Weldon Railroad Company, whose name had then been changed to the Atlantic Coast Line Railroad Company, that portion of the Atlantic and Yadkin Railway Company lying east of Sanford and extending through Fayetteville to Wilmington, and from Fayetteville to Bennettsville, South Carolina, including the leasehold estate of the Bennettsville division. The resolution is made a part of the complaint. The Southern Railway Company acquired all the stock of the Atlantic and Yadkin Railway Company, and by virtue thereof became the owner of all that part of this railroad lying between Mount Airy and a designated point in Sanford, including all branches and sidetracks between these *termini*. It is alleged that in this way the dismemberment of the property was brought about.

In 1913 the General Assembly passed a resolution reciting the alleged dismemberment of the Atlantic and Yadkin Railway Company, directing the Corporation Commission to investigate any matters pertaining to a sale of any part of said road to the Wilmington and Weldon Railroad Company and to the Southern Railway Company, and empowering the commission to subpoena and examine witnesses and to cause the production of books and documents. Pursuant to this resolution, the commission began an investigation on 8 September, 1913, and examined H. Walters, one of the purchasers named above, who testified as set forth in Exhibit D, which is attached to the complaint. This was the first communication, concerning the sale, made to any board or body representing the State. (Excerpts from testimony of Walters omitted.) It is alleged that the said purchase and dismemberment of the property

of the Cape Fear and Yadkin Valley Railway Company was contrary to law, was conceived in fraud and for the purpose of evading the decree of the court, which authorized the sale of said property as an entirety, deceiving and misleading the Legislature of the State of North Carolina, and evading the act of 1897, chapter 305, for the purpose of committing and working a great injury to the people of the State of North Carolina, and especially those people living in the sections of the said State traversed by said road. It is alleged that the acts of the Southern Railway Company and the Wilmington and Weldon Railroad Company, through its officers and agents, constituted a conspiracy to violate the antitrust laws of the United States and to violate the laws of the State of North Carolina; that the said deed of the Atlantic and Yadkin Railway Company to the Wilmington and Weldon Railroad Company was fraudulent and contrary to law, and was executed in violation of the laws of this State; that the same is void and should be surrendered and canceled, and the said property formerly composing the Cape Fear and Yadkin Valley Railway Company and purchased by the Atlantic and Yadkin Railway Company should be operated and its franchises enjoyed as an entirety. Following is the prayer for judgment:

"Plaintiff prays that the deed dated 13 May, 1899, by the Atlantic and Yadkin Railway Company to the Wilmington and Weldon Railroad Company or the Atlantic Coast Line Railroad Company be canceled and all of the property conveyed therein be surrendered to the said Atlantic and Yadkin Railway Company; for the costs of this action, to be taxed by the clerk of this court, and for such other and further relief as the plaintiff may be entitled to, at law or in equity."

In 1923 the Legislature adopted the following resolution: "That the Attorney-General is hereby authorized and empowered and directed to proceed without delay, and report progress to Governor and Secretary of State, to institute such action or actions as may be desirable or necessary to dissolve the alleged illegal dismemberment of said road, in order that it may be restored as a continuous east and west line, as contemplated by the State in the granting of original charter." Res. 47, p. 641, Laws 1923.

The action was brought in pursuance of this resolution.

Each defendant filed a separate demurrer to the complaint, and in each demurrer are assigned substantially the following grounds:

1. The complaint shows upon its face that James S. Manning is not the real party in interest, etc.

2. It does not appear from the allegations of the complaint that either the named plaintiff or the State of North Carolina has any interest in the alleged cause of action attempted to be set up by the complaint.

3. The complaint does not allege any facts showing any violation of law or public policy of the State, but on the contrary alleges facts showing authority under the law of North Carolina for the doing of all the acts complained of therein.

4. The complaint does not set up any facts which show or tend to show that "the said purchase and dismemberment of the property of the Cape Fear and Yadkin Valley Railway Company was contrary to law, was conceived in fraud and for the purpose of evading the decree of the court which authorized the sale of said property as an entirety, deceiving and misleading the Legislature and evading the act of 1897, chapter 305, and of committing and working a great injury to the people of the State, and especially those people living in the sections of the State traversed by said road."

5. The complaint does not allege any facts which tend to show a conspiracy to violate any law of the State or the United States.

6. It appears from the complaint that the plaintiff is attempting to sue in the Superior Court on behalf of the State, through its Attorney-General, to enforce the provisions of the antitrust laws of the United States, being an act of Congress of 2 July, 1890, and the said action can only be brought in the name of the United States, through the Attorney-General of the United States and in the United States Court, and this court has no jurisdiction of the subject-matter of said action.

7. The complaint shows that the railroad referred to is operated in interstate commerce, and it is not alleged that there has been obtained from the Interstate Commerce Commission of the United States, as required by paragraph 18 of section 1 of the Interstate Commerce Act, as amended, a certificate that the present or future public convenience and security require or will require the acquiring and operation by the Atlantic and Yadkin Railway Company of that part of the old Cape Fear and Yadkin Valley Railway Company, now owned and operated by the Atlantic Coast Line Railroad Company.

8. The complaint does not allege that the Interstate Commerce Commission of the United States has, after a hearing, as required by section 8 of the Interstate Commerce Act, approved and authorized the acquisition by the Atlantic and Yadkin Railway Company of that part of the Atlantic Coast Line Railroad Company which was formerly the Cape Fear and Yadkin Valley Railway Company, lying to the east of Sanford.

9. It appears from the complaint that the granting of the relief prayed for therein would involve the merger of that part of the old Cape Fear and Yadkin Valley Railway Company east of Sanford with the railroad owned by the Atlantic and Yadkin Railway Company, and the complaint does not allege that such merger has been authorized or

approved by the Interstate Commerce Commission, as required in case of interstate railroads by the Transportation Act of 1920, amending section 5 of the Interstate Commerce Act by adding thereto paragraphs 4, 5, 6, 8, by which Congress has taken exclusive jurisdiction of the merger of railroads engaged in interstate commerce, and under which no consolidation may be made, except upon approval of the Interstate Commerce Commission, as therein provided.

10. The plaintiff has not shown good faith and due diligence:

(a) For that it appears from the allegations of the complaint that the Cape Fear and Yadkin Valley Railway Company was sold under foreclosure proceedings, as directed by a decree of the Circuit Court of the United States for the Eastern District of North Carolina, which sale was confirmed by an order of said court in December, 1898, from which an appeal was taken, and said decree of sale was confirmed by the Circuit Court of Appeals of the United States for the Fourth Circuit, on 5 May, 1899, and it does not appear that any action or proceeding was instituted by any party to said decree, or any person whatsoever, or by the State of North Carolina, or the Attorney-General of North Carolina, until May, 1923, although it appears from the complaint that the General Assembly of North Carolina of 1913, by joint resolution, authorized an investigation by the North Carolina Corporation Commission of all matters pertaining to the sale of any part of the Atlantic and Yadkin Railway Company to the Wilmington and Weldon Railroad Company and to the Southern Railway Company, and that such investigation was had and all of the information in possession of this defendant, and other parties, concerning the sale of the Cape Fear and Yadkin Valley Railway Company and the sale of that portion of' the same by the Atlantic and Yadkin Railway Company lying east of Sanford, North Carolina, was then obtained and made known, and this defendant avers, therefore, that there has been such gross laches as would bar and estop the plaintiff from now maintaining this action.

(b) For that it appears from the allegations in the complaint that the purchasers of the said Cape Fear and Yadkin Valley Railway Company at said foreclosure sale acquired title to said property under and in strict conformity with the terms and provisions of said decree of the Circuit Court of the United States and of the statutes of the State of North Carolina, and said line of railroad and property taken was legally vested in said purchasers and their successors in title, including the defendant, as set out in the complaint, and that bonds secured by mortgages upon the said property were issued and sold to the public, and additions and betterments placed upon the said property, and the rights of third parties have intervened, and it does not appear that any action was instituted by the Attorney-General of North Carolina, or the State

of North Carolina, or any other person or persons, until 1923, although investigation was made under the direction of the Legislature of North Carolina in 1913 and all of the facts in connection with said transaction obtained by the Corporation Commission at that time, during all of which long time this defendant and its predecessors in title and the holders of said bonds so placed upon said property have been in the enjoyment of their rights acquired under and through said decree, and the mortgage foreclosure sale, and the acts confirmatory thereof, and the mortgage bonds issued thereon, and this defendant says that plaintiff has been guilty of such gross laches as would bar him from maintaining this action.

The Atlantic Coast Line Railroad Company demurred on the following additional grounds:

11. The relief prayed for is the cancellation of a deed from the Atlantic and Yadkin Railway Company to the Wilmington and Weldon Railroad Company and the surrender of the property conveyed by the Atlantic and Yadkin Railway Company, and the complaint contains no prayer requiring the Atlantic and Yadkin Railway Company to return to the Atlantic Coast Line Railroad Company or the Wilmington and Weldon Railroad Company the consideration paid by those companies to the Atlantic and Yadkin Railway Company for the railroad property conveyed in said deed, which is sought to be canceled, and there is no offer in the complaint on the part of the plaintiff to place the purchaser *in statu quo.*

12. It appears from the complaint that the court is without jurisdiction of the subject of the action, so far as there may be involved any violation or departure from the terms of the decree of the Circuit Court of the United States, in that it appears therefrom:

(a) That the sale was made pursuant to and in conformity with the terms of said decree conveying said property as an entirety.

(b) That the said sale was submitted to, considered by, and confirmed by the said United States Circuit Court.

(c) That said sale and conveyance, made pursuant to said decree, were specifically confirmed and ratified by the General Assembly of North Carolina, aforesaid.

13. The Southern Railway Company demurred on the further ground: The complaint does not allege any facts which show any such interest of this defendant as to make it a proper party to the controversy. This defendant is not a necessary party to a complete determination of the questions involved. The complaint does not, therefore, state a cause of action against this defendant.

At the hearing the lower court sustained the demurrers and each of them, and dismissed the action. The plaintiff excepted and appealed.

Pending the appeal the General Assembly, at the Special Session of 1924, adopted a joint resolution in reference to the Atlantic and Yadkin Railway Company, and appointed a committee to investigate the matters therein referred to. By permission of the court, the committee filed a supplemental brief, which was considered in connection with the other briefs filed in the cause.

*Attorney-General Manning, Assistant Attorney-General Nash, John D. Bellamy, J. Lathrop Morehead, and A. L. Brooks for plaintiff.*

*George B. Elliott, V. E. Phelps, Murray Allen, and Thomas W. Davis for the Atlantic Coast Line Railroad Company.*

*S. R. Prince and Manly, Hendren & Womble for the Atlantic and Yadkin Railway Company.*

*L. E. Jeffries and W. B. Snow for the Southern Railway Company.*

ADAMS, J. The Attorney-General is authorized to bring an action in the name of the State against a corporation for the purpose of annulling its charter on the ground that it was procured by fraud or the concealment of a material fact by the persons incorporated, or by some of them, or by others with their knowledge or consent. He may bring such action for the purpose of annulling the existence of a corporation, other than municipal, when such corporation offends against the act creating, altering, or renewing it, or violates any law by which it has forfeited its charter by abuse of its power, or has forfeited its privileges or franchises by failure to exercise its powers, or has done or omitted any act which amounts to a surrender of its corporate rights, privileges, and franchises, or has exercised a franchise or privilege not conferred upon it by law, or when it has done certain other acts not germane to the present investigation. C. S., 1187.

The plaintiff's argument, at least in part, is predicated on the theory that the action is prosecuted under this section to procure a forfeiture of the charter granted by the General Assembly to the Atlantic and Yadkin Railway Company; but the defendants combat this position. They contend, as alleged in the complaint, that the action was instituted pursuant to the resolution adopted by the General Assembly of 1923; that the object therein contemplated is merely to set aside the alleged illegal sale of a part of this company's property; that the allegations of the complaint are addressed to this purpose, and that the relief prayed is the cancellation of the deed executed on 13 May, 1899, by the Atlantic and Yadkin Railway Company to the Wilmington and Weldon Railroad Company. The defendants urge the further argument that the action is not in the nature of *quo warranto;* that it does not relate to the usurpation or unlawful exercise of a franchise; and that neither

the plaintiff nor the State has a legal or justiciable interest in the cause of action set up in the complaint.

All these divergent contentions need not now be considered, for the defendants take certain positions which, if sound, will render unnecessary our determination of any question relating to the parties in interest or to the form of the action. Two of the propositions which the defendants undertake to maintain are these: (1) The sale of a part of the Atlantic and Yadkin Railway Company to the Wilmington and Weldon Railroad Company was authorized by law and is therefore valid. (2) The plaintiff has not shown good faith and reasonable diligence, and is estopped by laches from maintaining this action. Each proposition will be considered in its order.

The act incorporating the Atlantic and Yadkin Railway Company is made a part of the complaint. So likewise is the resolution adopted both by this company, as seller, and by the Wilmington and Weldon Railroad Company, as purchaser, in reference to the sale of that part of the system lying to the east of Sanford. The charter of the Atlantic and Yadkin Railway Company has this section: "The said company shall have the right to consolidate with any other railroad company organized under the laws of this State with which it may connect, directly or indirectly, on such terms and conditions as may be agreed upon by and between the stockholders of this and any other such company: *Provided,* that any corporation or company consolidated under the provisions of this act shall be a domestic corporation and subject to the laws and jurisdiction of North Carolina." Private Laws 1899, ch. 98, sec. 6. The resolution referred to, hereinafter set out, embodies a part of the act of 1899 (Private Laws, ch. 105) amending a former act (Private Laws 1893, ch. 284), which authorized the consolidation of the Wilmington and Weldon Railroad Company with any other railroad company with which it was directly or indirectly connected.

It is obvious, then, that the immediate question is whether the General Assembly, by the passage of these several acts, authorized the Atlantic and Yadkin Railway Company to sell and the Wilmington and Weldon Railroad Company to purchase the property described in the resolution and in the deed which was executed in pursuance of it.

On several grounds the plaintiff denies that the Legislature conferred such authority, or at any rate denies the efficacy of such alleged grant of power. His first position is that these private acts are void, because they purport to authorize a single railroad company to purchase, in whole or in part, all the connecting lines within the State, or any of them; that such pretended grant of power is against public policy, contrary to the common law and the bill of rights, and invalid as an unlawful attempt to suppress competition.

42—188

Pretermitting the question whether an act of the General Assembly should be construed as against public policy or the common law, we are not disposed to controvert the force of an argument based as a general rule on the grounds assigned by the plaintiff; but we do not understand that the Legislature granted to the Wilmington and Weldon Railroad Company the extensive and sweeping powers attributed to it in the plaintiff's brief. The right to consolidate or merge its railroads with others and to buy or lease other railroads may not be exercised by the company in its unrestrained discretion; for such consolidation or merger and such sale or lease may be made with or by those railroads only which are authorized by the Legislature to make such consolidation, merger, sale, or lease. It may reasonably be presumed in these circumstances that the General Assembly, which has the power to grant or withhold the right, will neither permit the creation of a monopoly nor authorize nor approve an act which would be illegal or against public policy; for the Legislature, out of due regard for the public welfare, may declare that the charter of a corporation shall not be used for the purpose of stifling competition and building up monopolies. *Pearsall v. Great Northern Railway Co.*, 161 U. S., 646; 40 Law Ed., 839, 848. In any event, we think such apprehended danger is not inherent in the act under which the sale is alleged to have been made, or that the act is reasonably susceptible of the construction insisted on by the appellant.

The plaintiff further contends that in the enactment of chapter 105 of the Private Laws of 1899 it was not the purpose of the Legislature to sever the Atlantic and Yadkin Railway, but to authorize the Wilmington and Weldon Railroad Company to purchase connecting lines within the State in order to establish an unbroken system between Virginia and South Carolina. On the hearing before the Corporation Commission, H. Walters, one of the purchasers at the commissioners' sale, testified substantially that the bill was originally intended by the purchasers to accomplish this purpose. It is contended, therefore, that the act should be given only such meaning as the purchasers, who procured its passage, had in mind—that is, authority to purchase the Norfolk connection, a part of the Petersburg Railroad, a part of the Wilmington, Columbia and Augusta Railroad, and a part of the Cheraw and Salisbury Railroad, but no others.

It is elementary learning that neither the purpose nor the opinions of those who are not members of a legislative body can be regarded as an appropriate source from which to discover the meaning of a legislative act. In *United States v. Freight Association*, 166 U. S., 290; 47 Law Ed., 1007, 1020, it was held that even debates in Congress may not be resorted to for this purpose, the reason being that it is impossible to determine with certainty what construction was put upon an act by the

members of the legislative body that passed it by resorting to the speeches of-the individual members. Those who do not speak may not agree with those who do, the result being that the only proper way to construe a legislative act is to construe the language used in the act.

The statute must be regarded, not as the creature of the purchasers, but as the will of the Legislature, and its meaning must be ascertained by applying the ordinary principles of statutory construction. The object of judicial interpretation is to determine the legislative intent, and, to this end, words should generally be given their popular meaning if they have not acquired a meaning which is technical. It is only when the terms of a statute are ambiguous or of doubtful construction that the courts may exercise the power of controlling the language in order to give effect to what they suppose to have been the real intention of the lawmakers. If the language is not ambiguous and the intent is plain, there is no reason for resorting to external circumstances as an aid to interpretation, for in such case there is really no ground for construction. We must therefore ascertain the intention of the General Assembly from the language of the acts, and not from the wish or intention of the purchasers who were interested in the legislation. Endlich Interpretation of Sts., chs. 1 and 2; Lewis' Sutherland St. Con., sec. 363 et seq.; United States v. Freight Assn., supra; Standard Oil Co. v. United States, 121 U. S., 1; 55 Law Ed., 619; Whitford v. Ins. Co., 163 N. C., 223; Highway Com. v. Varner, 181 N. C., 42.

That part of the statute which is incorporated in the resolution referred to and made a part of the complaint follows: "Authority is hereby given to the Wilmington and Weldon Railroad Company to consolidate or to merge its railroads with, or to buy or lease the railroad or railroads of any other railroad company with which it may connect, either directly or indirectly, organized under the laws of this State or of any adjoining State which, under the laws of this or such other State, may have power to consolidate, merge, sell or lease its road; and any such other company shall have the right to consolidate, merge, sell or lease its railroad, in whole or in part, with or to the Wilmington and Weldon Railroad Company; and such consolidation, merger, sale or lease may be made between the Wilmington and Weldon Railroad Company and any other such company upon such terms and conditions as may be agreed upon by a majority of the stockholders of each corporation entitled to vote at all stockholders' meetings." Private Laws 1899, ch. 105, sec. 1.

This amendatory act was ratified on 24 February, 1899, the day after the Atlantic and Yadkin Railway Company was incorporated and authorized to consolidate with any other railroad company organized under the laws of this State with which it was directly or indirectly

connected.   The Wilmington and Raleigh Railroad Company, after-
wards the Wilmington and Weldon Railroad Company, was organized
under the laws of North Carolina.   Laws 1833-34, ch. 78; Private Laws
1893, ch. 100.   The Legislature is presumed to have had knowledge of
the direct physical connection of the selling and purchasing roads, of
the purpose and scope of these acts, and of the legal effect of the pro-
visions authorizing a sale, lease, merger or consolidation by or with the
connecting lines; and if it authorized the sale in question, its intention
to do so must be conclusively presumed.

Did these statutes authorize a sale of the property to the Wilmington
and Weldon Railroad Company?

The plaintiff contends they did not; that to support the sale the
defendants must show, not only that the purchasing company was
authorized to buy, but that the selling company was also expressly
vested with power to sell.   This proposition is upheld in *Arkansas v.
Choctaw & M. R. Co.,* 134 Fed., 106, cited by the plaintiff, but the case
does not decide the point before us, because the act of Congress there
reviewed related exclusively to the right of purchase, not of sale, and
the State law authorizing the sale presented no Federal question and
was not considered.   Nor do we construe the remaining cases cited by
the plaintiff as conclusive upon this question.

It may be deemed the established doctrine, however, that these cor-
porations at the time of the sale had a right to exercise only such powers
as had been expressly conferred upon them by the General Assembly,
either in the acts creating them or in subsequent legislation, and such
implied powers as were necessary to enable them to use the powers
expressly granted.   *Oregon Railway v. Oregonian Railway,* 130 U. S., 1;
32 Law Ed., 837; *Thomas v. Railroad Co.,* 101 U. S., 71; 25 Law Ed.,
950; *Victor v. Mills,* 148 N. C., 107; *Barcello v. Hapgood,* 118 N. C.,
712; *Wiswall v. Plank Road Co.,* 56 N. C., 183.   The meaning is,
they had the power by implication to do whatever was necessary to
carry into effect the purposes of their organization, unless the particular
act was expressly prohibited; but as the contested sale was not essential
to the original purposes of either organization, we must ascertain
whether it was consummated by virtue of authority expressly conferred.

Conceding that such authority was necessary, we are of opinion it need
not have been conferred exclusively by an express amendment of the
charter of the selling corporation.   It is sufficient if the power was
granted, though not by way of amending the charter.   The important
thing is the grant of power, not the mode in which the power is granted.
*Ferguson v. Meredith,* 1 Wall., 25; 17 Law Ed., 604; *Ashley v. Ryan,*
153 U. S., 436; 38 Law Ed., 773; *Vicksburg v. Vicksburg Waterworks,*
202 U. S., 453; 50 Law Ed., 1102; *Spencer v. R. R.,* 137 N. C., 107.

We concede further that a grant of power by the State is ordinarily to be construed strictly against the grantee, and that nothing will be presumed to pass unless it be expressed in clear and unambiguous language; but it should not be so construed as to defeat the manifest intention of the Legislature. *Pearsall v. Great Northern Ry. Co., supra; Black v. Canal Co.,* 22 N. J. Eq., 130.

The Legislature, as we interpret the statute, not only gave to the purchasing corporation the right to buy, but vested in the selling corporation the power to make the sale. A statute similar to the one under consideration was construed by this Court in *Spencer v. R. R., supra.* There it appeared that the Legislature had granted the Seaboard Air Line Railway the right to exercise the following powers: "With the approval of two-thirds in amount of its stockholders, given at any annual meeting or a meeting specially called for that purpose, or a meeting at which all the shares of capital stock are represented, in person or by proxy, it may from time to time lease, use, operate, consolidate with, or purchase, or otherwise acquire, or be leased, used, operated by or consolidated with the Seaboard and Roanoke Railroad Company and any railroad or transportation company now or hereafter incorporated by the laws of the United States or any of the States thereof, whether such company be formed by the consolidation of other companies or not; and from time to time it may consolidate its capital stock, property and franchises, by change of name or otherwise, with the capital stock, property and franchises of any other such railroad or transportation company, upon such terms as may be agreed upon by the respective companies, power being hereby granted to any railroad or transportation company or companies now or hereafter incorporated by or under any act or acts of the General Assembly of the State of North Carolina, with the approval of a majority in amount of its shareholders, respectively, given at a meeting specially called for such purpose, or at which all the shares of capital stock are represented, in person or by proxy, to make and carry out such contracts of consolidation or lease, sale, or other method of acquisition or disposition." Private Laws 1901, ch. 168.

One of the questions for decision was whether this act conferred any authority upon the Seaboard Air Line Railway Company to consolidate, merge with, or purchase from any railroad other than the Seaboard and Roanoke Railroad Company, which was the only other company specifically named in the act.

Speaking to this question, *Mr. Justice Connor* said: "The plaintiff says that a careful analysis of chapter 168, Private Laws 1901, fails to show that any authority is conferred upon the Seaboard Air Line Railway Company to consolidate, merge with, or purchase from any other

railroad than the Seaboard and Roanoke Railroad Company; that the statute conferring such extraordinary power upon railroad corporations should be clear and explicit, leaving nothing to construction and doubt. Why that single corporation should have been named in conferring the power, and other railroad companies referred to in general terms, does not very clearly appear. We think, however, that by a fair and reasonable interpretation of the language of the act the Raleigh and Gaston Railroad Company is included among those companies with which the Seaboard Air Line Company is empowered to consolidate—'and any railroad or transportation company now or hereafter incorporated by the laws of the United States or any of the States thereof.' In conferring power upon other companies to consolidate, the language is equally comprehensive—'power being hereby granted to any railroad or transportation company or companies now or hereafter incorporated by or under any act or acts of the General Assembly of the State of North Carolina,' etc. The Raleigh and Gaston Railroad Company certainly comes within this classification. It would seem to follow that the other provisions of the act, unless otherwise expressed, must be construed as referring to all companies thus included in the class upon which the power is conferred to consolidate. Any other construction would render nugatory the power conferred. The plaintiff next insists that no consolidation can take place unless the power to so consolidate is expressly conferred upon both consolidating corporations. This proposition is sustained by the authority cited. The reasons therefor are manifest. 10 Cyc., 293. We think that such power is conferred upon both corporations. Chapter 168, section 1, expressly confers upon the Seaboard Air Line Railway Company the power, 'with the approval of two-thirds in amount of its stockholders,' etc., 'to lease, operate, consolidate with, or otherwise acquire,' etc. As we have seen, the power is conferred upon the Raleigh and Gaston Railroad Company to enter into the contract of consolidation," etc. See, also, *Camden & Atlantic Railroad v. May's Landing,* 7 At., 523, and *Matter Prospect Park Railroad,* 67 N. Y., 377.

While not contesting the correctness of this decision, the plaintiff says that it does not apply to the instant case, because the purpose of the act therein considered was to establish a trunk system through the State, and the question of public policy was not discussed. Whether the purpose was to establish a trunk-line system does not clearly appear; but, however that may be, the statute was given a judicial construction, and that is the matter with which we are now concerned—not the alleged unlawful conspiracy, to which we shall hereafter advert.

By the express terms of the act of 1899, authority was given the Wilmington and Weldon Railroad Company to buy the railroad or railroads

of any other railroad company with which it was directly or indirectly connected, if the latter was organized under the laws of this State and authorized either to consolidate, or merge, or sell, or lease its road; and upon such other company was conferred the power to sell its road, in whole or in part, to the Wilmington and Weldon Railroad Company. It would seem not to admit of doubt that this language is broad enough to embrace both the power to sell and the power to buy. The suggestion that the charter of the Atlantic and Yadkin Railway authorized its consolidation with another railroad only as an entirety is without force, for the power to consolidate, in whole or in part, was given by the General Assembly in the amended charter of the Wilmington and Weldon Railway Company; and if the power was conferred, we cannot approve the proposition that the deed for the part of the road to the east of Sanford should be canceled on the ground that its execution was *ultra vires.*

On behalf of the plaintiff it is also urged that the defendants, by demurring, have admitted all the allegations of the complaint, one of which is that the sale of the railroad was the result of a fraudulent conspiracy to evade the State and Federal statutes and the decree of the Federal court, and to deceive the Legislature of North Carolina. The paragraph containing this allegation appears in the foregoing statement of facts.

A demurrer is the formal mode of disputing the sufficiency in law of the pleading to which it pertains. It admits only such averments as are well pleaded and such inferences as may be drawn therefrom, but it does not admit any legal inferences or conclusions of law that may be alleged. We must therefore refer to the complaint in order to determine the scope and effect of the defendants' admissions. Bliss on Code Pleadings, sec. 418, *et seq.;* C. S., 511; *Prichard v. Comrs.,* 126 N. C., 908; *Wood v. Kincaid,* 144 N. C., 393; *Ollis v. Furniture Co.,* 173 N. C., 542; *Hipp v. Dupont,* 182 N. C., 9; *Bank v. Bank,* 183 N. C., 463; *Sandlin v. Wilmington,* 185 N. C., 257.

The decree rendered by Judge Simonton applied exclusively to the foreclosure sale under the deeds of trust executed by the Cape Fear and Yadkin Valley Railway Company to the Farmers Loan and Trust Company, of New York, and the Mercantile Trust and Deposit Company, of Baltimore. *Farmers Loan and Trust Co. v. C. F. & Y. V. Ry. Co.,* 82 Fed. R., 344, 350; *Low v. Blackford,* 87 Fed. R., 392. The decree directed a sale in its entirety of the property described in these deeds of trust. The terms of this decree were complied with. Indeed, the plaintiff alleges that the property was sold as an entirety, that the sale was confirmed, and that the property was conveyed by deed to the Atlantic and Yadkin Railway Company.

As we discover no sufficient allegation of fraud up to this point, we are next to inquire into the transactions between the Atlantic and Yadkin Railway Company and the Wilmington and Weldon Railroad Company. The plaintiff alleges that in the early part of May, 1899, the directors of the former company, contrary to the provisions of its charter, and in violation of the decree of the Federal court, undertook by resolution to dismember its property by making the sale to the other company.

In what way the decree of the Federal court was violated is not specifically alleged. Judge Simonton held that the mode of sale was wholly within the discretion of the court, but his decree, as we have seen, was confined to the matters in litigation in the foreclosure suit and did not purport in any way to control or regulate the exercise of powers by the purchasing company. If the allegation should be construed to mean that the purchasers at the foreclosure sale contemplated the severance of the property acquired by the Atlantic and Yadkin Railway Company, the answer is that the property was conveyed to this company in its entirety, as the decree required; and if the deed of the Atlantic and Yadkin Railway Company was executed in pursuance of legislative authority, it cannot be deemed to have been executed fraudulently or in breach of the provisions contained in its charter. That such authority was conferred we have already pointed out. As we understand the record, the allegation that the Legislature was deceived is not sustained by the apparent facts.

In *Merrimon v. Paving Co.,* 142 N. C., 539, 552, the Court said: "It is a fundamental rule of pleading that when a plaintiff intends to charge fraud he must do so clearly and directly, by either setting forth facts which in law constitute fraud or by charging that conduct not fraudulent in law is rendered so in fact by the corrupt or dishonest intent with which it is done." *Lanier v. Lumber Co.,* 177 N. C., 200; *Galloway v. Goolsby,* 176 N. C., 635; *Mottu v. Davis,* 151 N. C., 237; *Beaman v. Ward,* 132 N. C., 66.

We are assured that the learned counsel who prepared the complaint had in mind this familiar principle, and set forth the allegations relating to fraud with all the certainty and particularity that the sources of their information justified, and that the want of more definite allegations cannot be attributed to oversight on their part; but, after an analytical examination of the record, the exhibits and the briefs, we are satisfied that the complaint does not contain such definite allegations of fraud as demand the intervention of a jury. The demurrers do not in this respect admit a cause of action. See Private Laws 1899, ch. 98, sec. 2, ratifying the action of the purchasers and their associates; *Reid v. R. R.,* 162 N. C., 355; *Satterfield v. Kindley,* 144 N. C., 455; *Bailey*

*v. Morgan,* 44 N. C., 353; *Goode v. Hawkins,* 17 N. C., 393; *Smith v. Greenlee,* 13 N. C., 126; *Hyer v. Richmond Traction Co.,* 168 U. S., 471; 42 Law Ed., 547.

The second proposition is that the plaintiff is estopped by laches to prosecute this action.

Whatever the rule in other jurisdictions, it seems to be established that the doctrine embodied in the ancient maxim, *"Nullum tempus occurrit regi,"* obtains with us only in exceptional cases. "The limitations prescribed by law apply to civil actions brought in the name of the State, or for its benefit, in the same manner as to actions by or for the benefit of private parties." C. S., 420. The Court has construed this section to mean that the maxim has been abrogated and is not in force in this State unless the statute applicable to or controlling the subject otherwise provides. *Furman v. Timberlake,* 93 N. C., 66; *Threadgill v. Wadesboro,* 170 N. C., 641. True, in the two cases of *Wilmington v. Cronly,* 122 N. C., 383, 388, there is apparently a contrary ruling. Whether a distinction may not be found in the public policy of preserving the public revenues (in *Cronly's cases* the collection of delinquent taxes), or in the statute controlling the subject, we need not decide; but it is worthy of note that in neither of the cases last cited is section 420, *supra,* referred to, and that the contrary doctrine is expressly adhered to in *Threadgill's case,* citing *Wilmington v. Cronly.* See, also, *Tillery v. Lumber Co.,* 172 N. C., 296.

With respect to this question the plaintiff's position is that courts of equity, in applying the doctrine of laches, follow by analogy the statute of limitations, and that the defendant's alleged misuser, nonuser, and usurpation of corporate powers constitute a continuing cause of action, to which no statute of limitations can apply. Independently of the statute of limitations, the doctrine of laches has existed since the beginning of equity jurisdiction. It rests upon the principle that nothing can call into exercise the powers of a court of chancery but conscience, good faith, and reasonable diligence. *Vigilantibus, non dormientibus, leges subveniunt.* While the staleness of a demand is a valid defense to the enforcement of a neglected right, there is yet no absolute rule as to what constitutes laches, and in the strict sense no one decision constitutes a precedent for another. "Each case is to be determined according to its own peculiar circumstances. In other words, the question of laches is addressed to the sound discretion of the chancellor." 21 C. J., 217; 1 Story's Eq. Jurisprudence, 71, 3 *ibid.,* 1972.

The final decision in the foreclosure suit was rendered on 3 May, 1898; the sale of the Cape Fear and Yadkin Valley Railway Company was made on 29 December, 1898; the sale was confirmed, and the deed to the Atlantic and Yadkin Railway was executed on 31 January, 1899;

the act incorporating this company and authorizing its consolidation with connecting railroads organized under the laws of this State was ratified on 23 February, 1899; the act conferring upon this road and the Wilmington and Weldon Railroad Company power to consolidate, in whole or in part, was passed 24 February, 1899; and in the early part of May, 1899, the resolution authorizing the sale of the property in question was adopted.

It will be noted that a period of twenty-four years passed by before this action was brought. It is true that, by virtue of a resolution adopted by the General Assembly in 1913, the Corporation Commission was directed to investigate any matters pertaining to a sale of any part of the Atlantic and Yadkin Railway, and the Attorney-General was authorized to bring suit if in his opinion "an action could likely be maintained," or to request the Attorney-General of the United States to bring suit on behalf of the Government for the purpose of setting aside the sale; and, though an investigation was made, no suit was brought by the State or the Federal Government. Ten years elapsed before the second resolution was adopted by the General Assembly of 1923, authorizing the present action. The sale of the property to the Wilmington and Weldon Railroad Company and the purchase of stock by the Southern Railway Company are matters which were known to the agencies of the State. The defendants' position that the prosecution of the action is barred by undue delay would therefore seem to be fortified by strong reasoning; but if the conclusion we have reached upon the first proposition is correct—the conclusion that the sale of the line east of Sanford was authorized by law—there was no unlawful misuser, nonuser, or usurpation on the part of the defendants constituting a cause of action to which the doctrine of laches should be held to apply. If it were otherwise, the prosecution of the action after such long delay should not commend itself to the favorable consideration of the Court. *Spencer v. R. R., supra; Attorney-General v. R. R.,* 28 N. C., 456; *Hill v. R. R.,* 143 N. C., 539; *Arndt v. Ins. Co.,* 176 N. C., 652; *Brockenbrough v. Ins. Co.,* 145 N. C., 354; Noyes on Intercorporate Relations (2 ed.), sec. 49.

Our disposition of the propositions we have discussed renders it unnecessary to consider any of the Federal questions presented by the complaint and argued at length in the briefs of counsel.

A careful and critical examination of the record convinces us that the judgment of the lower court should be

Affirmed.

CLARKSON, J., concurring: I concur in the result reached by *Mr. Justice Adams* solely on the ground that the plaintiff is estopped by laches to prosecute this action.

Nearly a quarter of a century has elapsed since the dismemberment took place and before this suit was instituted. Innocent bondholders and others have acquired rights in this property as dismembered. The State, through its taxing power, has recognized the dismemberment. The severance of this east and west connection has, no doubt, as charged in this case, worked a great injury to the people of the section of the State through which the road operated as an entirety, but the long delay by the State in the assertion of its rights, with full knowledge of all the facts; the security of property rights acquired by innocent holders of bonds; the State, through its taxing power, having recognized all these years the dismemberment; the physical property being in the actual adverse possession of the railroad; the interest of public order and tranquillity, require diligence in the assertion of rights, and courts of equity have always refused to entertain stale claims.

The authorities fully recognize that from the lapse of time, under facts as presented in this case, courts of equity refuse to grant relief.

This Court, in *Sprinkle v. Holton,* 146 N. C., 266, said: "The security of property rights, the peace of families, and the public welfare demand that there must be an end of litigation. Courts of equity have always wisely refused to entertain 'stale claims.'"